Argued and submitted June 3, 1970, re-argued January 5,
affirmed May 12, 1971

CHANEY, *Appellant, v.* FIELDS
CHEVROLET CO., *Respondent.*
484 P2d 824

*John J. Haugh,* Portland, argued the cause and *Garry Kahn,* Portland, reargued the cause for appellant. With them on the briefs were Pozzi, Wilson & Atchison, Portland.

*R. Alan Wight,* Portland, argued and reargued the cause for respondent. With him on the brief were King, Miller, Anderson, Nash & Yerke, and Norman J. Wiener, Portland.

Before O'Connell, Chief Justice, and McAllister, Denecke, Holman, Tongue and Howell, Justices.

HOWELL, J.

This is an action for damages as the result of an alleged scheme to "cheat, swindle and defraud" plaintiff out of money due him upon the repossession and resale of a truck previously purchased by plaintiff from defendant. The plaintiff appeals from a judgment for defendant entered on a directed verdict.

Plaintiff filed an original and three amended complaints. In granting the defendant's motion for a directed verdict, the trial court held (1) that the plaintiff's original complaint was founded on breach of contract; (2) that the amended complaints changed plaintiff's theory to a tort action for fraud and deceit which was barred by the statute of limitations; and (3) that in any event plaintiff's proof failed to establish a cause of action for fraud and deceit.

It is not necessary for us to decide whether plaintiff changed his theory from breach of contract in the original complaint to a tort action for fraud and

deceit, and whether the latter is barred by the statute of limitations. Assuming that the original complaint and the subsequent complaints sounded in tort, we conclude that plaintiff failed to prove a cause of action for fraud and deceit sufficient to go to the jury.

The facts involved in the controversy are important.

On December 6, 1963, plaintiff purchased from defendant a used truck, with a van body, for a total price of $6,458.12, under a retail installment contract. During the next few months he suffered business reverses, making it impossible for him to continue these payments. It was then agreed that the truck would be returned by plaintiff and resold by defendant in accordance with the terms of the purchase contract. That contract was in the terms of a chattel mortgage and named defendant as the mortgagee. It also provided that:

> "*In the event of repossession of said property, mortgagee may* either *sell same* at public sale (at which mortgagee may bid) or dispose of same, *by private sale* or otherwise, in such manner and upon such terms as shall be commercially reasonable, without demand for performance, with or without notice to mortgagor (if given, notice by mail to address hereon being sufficient), with or without having said property at place of sale or other disposition thereof. *From proceeds of any such sale* or disposition of said property, mortgagee shall deduct all expenses for retaking, storing, repairing and selling or otherwise disposing of said property, including a reasonable attorney's fee. The balance thereof shall be applied to the amount due hereunder; *any surplus shall be paid over to mortgagor*; in case of deficiency, mortgagor shall pay the same with interest." (Emphasis added.)

The truck was then delivered by plaintiff to defendant for resale. At that time the balance due was $3,911.54. On July 21, 1964, the truck, without the van body, was resold for $4,000. A "Repossession Report" was then prepared by defendant's finance manager showing charges for repairs of $400 and for sales commission of $220 which (when added to the balance due of $3,911.54) resulted in a total cost of $4,531.54, or a "deficiency" of $531.54, after deducting the resale price of $4,000. In fact, however, no such repairs had been made, and the item of $400 was the inventory value placed upon the van body, which had been removed and was sold two weeks later for $865, resulting in a surplus payable to plaintiff.

Defendant's finance manager testified that in preparing the "Repossession Report" he mistakenly assumed that the item of $400 on the stock card was for repairs, instead of recognizing it to be a credit which should have been allowed to plaintiff for the inventory value of the van body, and that he did not discover that mistake until later.

Notwithstanding the fact that, as a result of the resale of the truck and the van body, defendant had collected money, part of which it had a duty to pay to plaintiff after deducting all proper charges, defendant nevertheless turned over the alleged deficit of $531.54 to a collection agency, which sent a form letter dated September 2, 1964, to plaintiff demanding payment of a balance due to defendant in that amount. Plaintiff then contacted the collection agency for information to "substantiate the billing and it referred him to defendant." He then called defendant, but "received no satisfaction on this matter. Nobody seemed to be able to tell me what it was for."

Plaintiff heard nothing further for over a year, and then received another form letter from the collection agency, dated September 21, 1965, stating that "our previous notices have been ignored," and threatening legal action unless the alleged balance of $531.54 was paid immediately. Upon receiving this second letter, plaintiff consulted an attorney, who then undertook to investigate the matter.

By letter dated September 29, 1965, plaintiff's attorney wrote to the collection agency, asking information how it arrived at the "deficiency" of $531 and was told that this was the balance remaining after addition of charges for repairs of $400 and a sales commission of $220. He then asked for copies of the repair documents and other documents involved, but received no answer. About a month later, in response to a letter to the repurchaser of the truck, he learned that the truck had been resold "less the van body."

For the next several months plaintiff's attorney wrote a series of letters to the collection agency, and then to defendant, asking for copies of documents supporting the repairs and commission, and also asking what credit was given for the van body. During that period the only response was a letter from defendant's finance manager stating that "due to microfilm process I have been unable to find repair documents" and offering to accept payment of a "deficiency" of $131.54.

On February 10, 1967, plaintiff's attorney wrote a final letter stating that he was aware of the fact that the van body had been sold separately and demanding payment of $750 as its value, "less what you are claiming as deficiency." Again, he received no response. The original complaint in this case was then filed on May 8, 1967.

On June 6, 1967, one month after the original complaint was filed, the attorney who then represented defendant, based upon his understanding of information supplied to him by defendant, wrote to plaintiff's attorney stating that the truck had been resold for $4,000 without the "box" (van body), less reconditioning costs of $400 and a sales commission of $220; that the "box" subsequently was resold for $400, resulting in "net proceeds of $3,780," and that since defendant paid GMAC $3,911.54, there was still a "deficiency," but offering to pay $250 to plaintiff to settle the case. In fact, however, as previously noted, there had been no such "reconditioning costs," and the van body had been resold for $865, but defendant's attorney was apparently not aware of such facts. By further letter dated June 15, 1967, defendant's attorney wrote to plaintiff's attorney that the $400 charges were not for "reconditioning" the truck, but for "selling and overhead expenses, exclusive of commissions."

In October, 1967, plaintiff's attorney learned, for the first time, that the actual resale price of the van body was the sum of $865. On November 28, 1967, after the substitution of plaintiff's present attorneys for his original attorney, an amended complaint was filed. Subsequently, two further amended complaints were filed.

The elements involved in a common law action of fraud and deceit were set forth in *Musgrave et ux. v. Lucas et ux.*, 193 Or 401, 410, 238 P2d 780 (1951):

"Comprehensively stated, the elements of actionable fraud consist of: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated;

(6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) and his consequent and proximate injury. [Citing cases.] * * *." 193 Or at 410.

■ The plaintiff failed to prove that he relied on any misrepresentation of the defendant. Plaintiff always considered that the defendant's claim for a deficiency was inaccurate, and he did not rely on it and refused to pay it.

The plaintiff does not seriously challenge the fact that the proof did not sustain the charge of fraud and deceit.① Although the case was tried in the trial court on the theory that the amended complaints, and particularly the third and last amended complaint, were based on fraud and deceit, the plaintiff for the first time in this court raises an entirely new theory. Plaintiff states that it is not necessary that his tort action "have a name" and now contends that he was entitled to have his case submitted to the jury on the theory of "extreme outrage," Prosser, Torts 47, § 11 (3d ed 1964); or "extreme and outrageous conduct" as it is denominated in 1 Restatement (Second) Torts 71, § 46 (1965). *See also Pakos v. Clark*, 253 Or 113, 453 P2d 682 (1969).

■ On oral argument the plaintiff frankly conceded

---

① In his brief in this court the plaintiff states:

"* * * With regard to [reliance by plaintiff] the defendant has an arguable point in asserting that this particular element was not expressly met. However, one could argue that the emotional trauma sustained by the plaintiff should be considered 'justifiable reliance' upon the false representation *or in deed that this particular element is not necessary where as here all other elements are found* and in light of the general principles enunciated above with regard to the common laws reticence to see any wrong go without a remedy and to see a cause of action fail for not having perfectly fit in one of the appropriated pigeonholes. * * *" (Emphasis added)

that this theory was not mentioned in the trial court. Under similar circumstances in *Edwards, Guardian, v. Hoevet*, 185 Or 284, 200 P2d 955 (1949), we stated:

> "This court is a court of review. We can not sustain verdicts and findings upon conceptions of the facts which the disfavored party never had an opportunity of contesting. A familiar rule of appellate practice restricts the appellant to the theory he pursued in the trial court. He can not in this court raise issues that he did not present and rely upon in the circuit court: [Citing cases.] * * *." 185 Or at 297.

As the issue of outrageous conduct was not presented in the trial court, it will not be considered for the first time in this appeal.

Affirmed.

HOLMAN, J., concurring.

The principal opinion expresses the view that a lawyer should be required to tell the trial court the theory upon which his case should be submitted to the jury. This opinion is supported by the public's interest in the efficient use of the judicial process. The dissenting opinion takes the position that as long as plaintiff's conglomeration of facts entitled him to go to the jury upon some theory, it is not fatal if he is unable to inform the court precisely of that theory. This opinion is supported by the public's interest in seeing that justice be served in individual cases.

No hard and fast rule can be laid down for the determination of cases in which two public interests are competing for primacy. Each case must be weighed on its facts. Here we have a case in which the facts rest on that further, imprecise edge of the law where change is taking place and law is being formulated. In such cases, which are not numerous, I would cast

my vote on the side of giving the plaintiff an opportunity to present his facts to the jury if they warrant it, despite his inability to formulate a precise theory for doing so. The standard demanded of plaintiff and his lawyer should not be as precise as where the legal paths have been frequently traveled.

The next question is whether plaintiff's facts made out the tort of outrageous conduct and, thus, entitled his case to go to the jury on his claim for emotional and physical injuries. The evidence is capable of the inference that defendant was attempting to retain unlawfully the balance of several hundred dollars owing to plaintiff from the proceeds of the resale of plaintiff's truck and that, in addition, defendant was trying to gouge him for an additional $531 to which defendant knew it was not entitled.

Restatement of the Law of Torts (Second) § 46, comment *d.*, has the following to say concerning what constitutes outrageous conduct:

"The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' "

The kind of conduct of which plaintiff's proof infers defendant was guilty is in the nature of attempted fraud. Plaintiff did not rely on what he was told, and defendant's attempt to take advantage of plaintiff was unsuccessful. There was no evidence of almost daily harassment or unusual methods of attempted collection of debts which form the basis for almost all similar cases of outrageous conduct.[1] Although the proof is capable of the interpretation that defendant's conduct was reprehensible in that it was dishonest, I do not get the feeling that a case of attempted fraud, minus unusual, bizarre, and particularly abusive methods of execution, is what the rule contemplates.[2]

I, therefore, concur in the result reached in the principal opinion.

O'CONNELL, C. J., and DENECKE, J., join in this concurring opinion.

TONGUE, J., dissenting.

The "principal opinion" (as it is referred to by the concurring opinion)[1] would affirm the granting of

---

[1] Of those cases cited in the dissenting opinion, all appear to be examples of daily harassment or unusual methods of attempted collection, or both, excepting Fletcher v. Western National Life Insurance Co., 10 Cal App 3d 376, 89 Cal Rptr 78 (1970).

[2] The dissenting opinion expresses concern because a layman would consider it outrageous that plaintiff does not recover even the amount defendant owed plaintiff. Perhaps the layman would not consider it to be so outrageous if it were explained to him that plaintiff did not choose to bring a cause of action on the basis of defendant's retaining money belonging to plaintiff, but, rather, elected to gamble on a speculative theory of recovery in the hope of securing large damages.

[1] The "principal opinion" is joined in by two members of the court, while the "concurring opinion" is joined in by three members.

a directed verdict in this case upon the following grounds: (1) that "the case was tried in the trial court on the theory * * * [of] fraud and deceit," and that plaintiff failed to establish the elements of such an action; and (2) that "plaintiff for the first time in this court raises an entirely new theory," that of "outrageous conduct," and that "on oral argument the plaintiff frankly conceded that this theory was not mentioned to the trial court." On these grounds the principal opinion would conclude that "as the issue of outrageous conduct was not presented in the trial court, it will not be considered for the first time on this appeal" because of the "rule of appellate practice that restricts the appellant to the theory he pursued in the trial court," quoting from *Edwards, Guardian v. Hoevet*, 185 Or 284, 297, 200 P2d 955 (1949).

Some of these statements are correct. It is most respectfully submitted, however, that others are contrary to the record in this case and that the conclusion reached by the principal opinion would recognize, if not tacitly approve, what in my opinion would constitute a "double standard" of judicial conduct.

I *This case was not tried on the theory of common law fraud and deceit.*

Neither the original nor the amended complaints were drafted on a theory of common law fraud and deceit. No attempt was made to include the usual allegations of the representations, its falsity, its materiality, knowledge by the defendant of its falsity or ignorance of its truth, intent that it be acted on, plaintiff's ignorance of its falsity, and plaintiff's reliance on its truth, etc. On the contrary, these pleadings proceed on a much more simple basis by alleging defendant's breach of its duty to pay to plaintiff the surplus

money remaining after resale of the truck and body and a "scheme to defraud" plaintiff from that money.

It is true that an order entered by Judge Sulmonetti on one of defendant's motions included the recitation, "it further appearing *to the court* that the amended complaint sounds in fraud and deceit." (Emphasis added) Plaintiff's counsel, however, although admitting that they prepared that form of order, stoutly contend that this recitation was included at the insistence of Judge Sulmonetti and that they have contended from the beginning that the amended complaint alleged facts sufficient to constitute a tort and that it was not necessary to place any particular "label" on such a tort.[2]

Similarly, the transcript of the trial includes no statement by plaintiff's counsel that "the theory he pursued in the trial court" was the theory of an action for common law fraud and deceit. On the contrary, he "characterized" the amended complaint as alleging both "a breach of contract" and a "scheme to defraud and cheat." Judge Davis, however, in ruling upon an offer of evidence and after referring to the recitation in the order by Judge Sulmonetti, stated that the complaint "on the face of it appeared to state a good cause of action in tort, in tort for fraud and deceit," which obviously was not true, as conceded by plaintiff.[3]

---

[2] The conclusion that plaintiffs, at least by their amended complaint, were not proceeding on a theory of common law fraud and deceit, and that this was later recognized by Judge Sulmonetti, would also appear to follow from the fact that when defendant demurred to that complaint for failure to allege the elements required in a common law action for fraud and deceit (which it clearly failed to do) that demurrer was overruled. Such a ruling could only be correct if the complaint is considered as proceeding on some other theory.

[3] It also appears from the transcript, that plaintiff's counsel then attempted to argue that the tort alleged in the amended

Thus, while plaintiff's counsel may not have stated that he was proceeding on a theory of "outrageous conduct," the record is clear that this case was not tried by plaintiff's counsel on a theory of fraud and deceit. It follows that even if, as stated in *Edwards v. Hoevet, supra,* the "rule of appellate practice restricts the appellant to the theory *he* pursued in the trial court," the principal opinion is incorrect in affirming the trial judge on the ground that "the case was tried in the trial court on the theory * * * [of] fraud and deceit."

The record also shows that upon the conclusion of the testimony defendant moved for a directed verdict on the primary ground that "there had been no showing of the elements required in fraud and deceit such as reliance, false representation, any of the traditional elements of fraud and deceit."

The trial court, however, instead of granting defendant's motion for directed verdict on that ground, proceeded to discuss whether the evidence was suf-

---

complaint was a "continuing tort" by reason of its allegation of "acts in relationship to this *scheme to cheat* the plaintiff and that these acts continued and occurred at times within the two years" of the statute of limitations. After further exchange between the court and counsel the following then appears:

"MR. KAHN: And I realize although your Honor just referred to the original complaint as setting up the allegation of fraud and deceit referring to punitive damage aspect of the original complaint, but certainly the defendant knew at that time that the theory was there, wasn't any surprise.

"THE COURT: Mr. Kahn, I am not going to argue. We have argued long enough. I am ruling right now the first cause of action is in contract and that the allegation of fraud and deceit comes under the theory of punitive damages and damages only. The second cause of action is in tort in fraud and deceit alleging personal injuries. Now, I am not going to argue any more. I have made a complete record on it."

ficient to prove "any fraud," or anything more than "negligence." In the course of his ruling the trial judge then made specific reference to "your theory of deceit *instead of fraud with the elements,* the *concept of conceal and hide*" (i.e., the theory of scheme to defraud) and held, after further discussion of the evidence, that "they weren't trying to hide they made a little piece of profit. They did not deceive or commit fraud."

Thus, it appears to be clear that the trial judge, in his final decision and after hearing all of the testimony, as well as argument by counsel, came to the conclusion (as did the trial court judge who overruled a demurrer to plaintiff's third amended complaint) that the case should not be decided as a common law action for fraud and deceit, but on the broader question whether there were sufficient allegations and evidence to establish the theory, as urged by plaintiffs, that defendant had been guilty of a "scheme to defraud" by "concealing" the surplus moneys which it was under a duty to pay to plaintiff.[④]

II *Plaintiff is entitled to have his case submitted to the jury if he alleged and proved facts which, if believed by the jury, would constitute "outrageous conduct," provided that defendant has been afforded a fair opportunity to be heard on that contention.*

It is true that during the trial plaintiff's coun-

---

④ This conclusion is inescapable regardless of the fact that, in deciding the case on that basis the trial court improperly undertook to pass upon the credibility of the testimony and chose to accept as true the testimony of defendant's witnesses, rather than to assume the truth of plaintiff's witnesses and to give plaintiff the benefit of all reasonable inferences from the evidence, as required in ruling upon a motion for directed verdict.

sel made no specific contention that the facts alleged constituted the tort of "outrageous conduct." Indeed, in this court, as in the trial court, plaintiff's primary contention has been that plaintiff pleaded and proved that defendant was guilty of a "scheme to defraud" plaintiff of surplus moneys belonging to him and that this constituted a tort entitling him to relief, without the necessity of placing any particular "label" on his pleading. It is only secondarily that plaintiff contends that if any "label" is necessary, such conduct satisfies the requirements for the tort of "outrageous conduct," as set forth in Prosser, Torts (3d ed) 47, § 11, and 1 Restatement (Second) Torts 71, § 46.

To deny to plaintiff the right to have his case submitted to the jury on such a basis the principal opinion must necessarily go beyond the rule of *Edwards v. Hoevet, supra,* as quoted in that opinion. This is because that rule goes no further than to "restrict *the appellant* to the theory he pursued in the trial court," unless it can be properly said that failure to attach a particular "label" to a complaint which alleges a good cause of action is a bar not only to the appellant, *but also bars this court* from considering in any case whether any plaintiff may be entitled to relief on some theory not specifically "labeled" by him in his complaint, or otherwise specifically mentioned by him in the trial court, although within the scope of the facts alleged in his complaint.

This the principal opinion would apparently forbid by expressly approving as a rule of law the statement that as a "court of review" this court "cannot sustain verdicts and findings" upon "conceptions" which the "disfavored party never had the opportunity of contesting," quoting from *Edwards v. Hoevet,* at

p 297.[9] On the contrary, it is a matter of common knowledge that on occasion this court has decided cases upon "theories" or "conceptions" not raised by either party on either trial or on appeal. Indeed, since the famous decision by the Supreme Court of the United States in *Erie R. Co. v. Tompkins*, 304 US 64, 58 S Ct 817, 82 L ed 1188 (1938), which was decided upon a theory not raised by either party to that case, the doctrine of "*sua sponte* consideration in appellate review," in the interest of justice, as well as efficiency in judicial administration, has been the subject of considerable discussion.[10]

The principal opinion of this court expressly approved the statement of a rule under which this court would say that it "cannot consider any theory suggested by either party other than the theory on which the case was tried, even though the opposing party has had full opportunity to be heard in this court on such a contention. At the same time, the principal opinion would leave this court free to decide cases on theories not raised by either party on either trial or appeal, and upon which neither party would have had an opportunity to be heard in any court. Such a decision, in my opinion, would approve, at least in effect, a "double standard" of judicial conduct by this court.

Of equal importance is the fact that in *Hoevet*, the sole authority cited by the principal opinion, it was stated, at p 298, that if such a rule had not been applied in that case "it may be that we would thereby deprive the respondent of defenses he would have

---

[9] Although the quotation set forth by the principal opinion refers to "conceptions of the facts," the effect of that opinion is to extend the doctrine to "conceptions of the law."

[10] See Vestal, "Sua Sponte Consideration in Appellate Review," 27 Ford L Rev 477 (1959). It would serve no constructive purpose to cite cases in which this court has applied that doctrine.

interposed had the complaint been framed upon the embraced theory." This, of course, goes to the basic and underlying reason for that general rule—to afford to the defendant the opportunity to defend and be heard.

I am in full accord with the view that in the ordinary case an appellate court should be extremely reluctant to decide a case on a "theory" or "conception" different than those urged by the parties, either on trial or on appeal, unless neither party would be prejudiced as a result and also *unless both parties are first given an opportunity to submit further briefs or argument.*

Indeed, it has been expressly held by this court in such a case that this court may properly consider new and different "theories" on appeal and, as a result, may reverse a judgment entered by the trial court. Thus, shortly after the opinion by ROSSMAN, C. J., in *Hoevet*, it was held, in *Hanscom v. Irwin*, 186 Or 541, 208 P2d 330 (1949), at pp 558-59, in an opinion by LUSK, C. J., as follows:

> "* * * we are met with the objection that the plaintiff is bound in this court by the theory pursued below and may not be heard to urge reversal of the decree on a different theory. 4 C. J. S., Appeal and Error, 479, § 241 e. This is the general rule and it has been applied in numerous cases by this court. But, like most general rules it has its limitations and exceptions. See, idem., 485, § 242. As pointed out by Mr. Justice Rosenberry in *Cappon v. O'Day,* 165 Wis. 486, 162 N. W. 655, 1 A. L. R. 1657, it is a rule established 'for the purpose of orderly administration and the attainment of justice * * * The reason for the rule is plain. If the question had been raised below, the situation might have been met by the opposite party by way of amendment or of additional proof.' In the Wis-

consin case the court of its own motion raised the question whether a chattel mortgage had been properly filed so as to make it valid as against third parties, held that the filing did not comply with the statute, and reversed the judgment notwithstanding that that question had not been raised in the court below. The question, the court said, 'had been fully argued' and 'the record is complete'.

"These things are true here."[①]

These same things are also true in this case, with the result that the general rule as stated by the principal opinion has no application to this case. This is because after the original arguments in this case the parties were both requested to submit additional briefs on the following question:

"When money belonging to another lawfully comes into the possession of one who fails to pay it to the owner, can such failure to pay occur under circumstances such as to make it tortious?"

Following the submission of such briefs, the case was also set for reargument. In both the original briefs submitted by the parties, and also in the supplemental briefs submitted in response to this request, as well as in both the original argument and the reargument of this case, counsel for both parties discussed the question whether the facts alleged and proved by plaintiff were sufficient to constitute the tort of "outrageous conduct." Furthermore, counsel for defendant admitted on reargument of this case, with commendable frankness, that he did not know of any prejudice that would be suffered by defendant if this case were to be remanded for new trial on such a theory.

---

[①] A somewhat similar rule would be recognized by the concurring opinion in this case, and properly so.

Thus, in my view, since the defendant in this case has had full opportunity to be heard on that question, and would have ample opportunity to defend on a retrial of this case, what this court should now do is to face up to that question and decide it on the merits. It is also my view that if plaintiff has alleged and offered evidence of sufficient facts to constitute the tort of "outrageous conduct," if such evidence is believed by a jury, he is entitled to have his case submitted to a jury for decision.

III  *Under modern pleading and practice a plaintiff who alleges and proves facts which entitle him to relief on any legal theory is entitled to have his case submitted to the jury.*

In *Ross v. Robinson,* 174 Or 25, 147 P2d 204 (1944), the entire concept of a "cause of action" was expanded and liberalized when this court, at p 36, endorsed the following rule:

"The principal function of pleadings is to enable litigants to bring their controversies to trial on the merits, and, generally speaking, the rules concerning pleadings should not be permitted to defeat a party's rights to a trial except when to do otherwise would be unjust to his adversary or violate some express command of the statute. We have long since left behind us the day when 'the fundamental principles of right and justice which courts were created to uphold and enforce were esteemed of minor importance compared to the quibbles, refinements, and technicalities of special pleading', * * * *"

and, at pp 44-45:

"* * * the term, 'cause of action', does not always and in all circumstances have the same meaning, and that in the context of a case like this it is to

be taken 'as a group of operative facts giving rise to one or more rights of action': Elliott v. Musgrove, 162 Or. 507, 544-552, 91 P. (2d) 852, 93 P. (2d) 1070. See, also, East Side Mill & Lumber Co. v. Southeast Portland Lumber Co., 155 Or. 367, 374, 64 P. (2d) 625; Asher v. Pitchford, 167 Or. 70, 77, 115 P. (2d) 337. * * *."

See also *Emerick Co. v. BohnenKamp & Assoc.*, 242 Or 253, 256, 409 P2d 332 (1965), and cases cited therein.

While the issue in *Ross v. Robinson* was whether an amendment to a pleading was "equivalent to the commencement of a new cause of action," the same rule should, in my judgment, be applied to the question presented in this case.

There is a further reason why this should be so. Court decisions based upon what laymen regard as "legal technicalities" are one reason for public lack of respect for law and lack of confidence in the courts as instruments of justice. In this day of attack upon the very foundations of government, the courts must seek ways to make the law more responsible to the human problems of today, including problems of consumers and debtors which sometimes arise from the conduct of retail sellers and creditors, including automobile dealers, rather than to perpetuate legalisms which are not always followed by the courts in actual practice.

This is not a case in which the trial in the circuit court was completed by submission of the case to a jury, based upon instructions on one theory, as prepared by a plaintiff, who, after a defendant's verdict, now seeks a new trial in order to ask that the case may be resubmitted to the jury on another theory. In this case plaintiff has never had the opportunity to

have his case submitted to a jury, since it was dismissed on motion for a directed verdict.

In my views the law should at least be consistent with reason to the extent that when a complaint alleges facts which, if proved, entitle plaintiff to relief on any legal theory, and when he offers evidence which, if believed by the jury, would support a verdict and judgment in his favor, he should be entitled to have his case submitted to the jury, rather than to have it dismissed because he has not attached the proper "label" to his pleadings.

Also, in my judgment, when under circumstances such as those involved in this case, the dismissal of such a case is appealed to this court, the fact that the proper "label" was not attached to the complaint or otherwise stated to the trial court is not, of itself, a valid reason to affirm its dismissal of the case. Conversely, I am of the opinion that in such circumstances it is not improper to remand such a case for submission to a jury by proper instructions on "outrageous conduct," particularly after both parties have had the opportunity to brief and argue that theory in this court. Such a result is particularly appropriate in this case for the reason that on argument counsel for defendant frankly stated that he was unable to point to any prejudice that would be suffered by defendant in such an event.[9]

---

[9] Such a result is also consistent with the law of election of remedies. Thus, even if it be conceded that plaintiff's complaint proceeded solely on a theory of common law fraud and deceit, since that remedy was not available to him he was not barred by the rule of election of remedies from filing a new complaint on a theory of "outrageous conduct." See Payne v. Griffin, 239 Or 91, 95, 396 P2d 573 (1964), and cases cited therein. *A fortiori*, if plaintiff's pleadings and proof were sufficient, if believed by a jury, to support a verdict and judgment for "outrageous conduct," he should not be denied the right to submit his case to a jury.

IV  *Plaintiff alleged and proved facts which, if be-*
*lieved by a jury, could properly be found by it to*
*constitute the tort of "outrageous conduct."*

On April 23, 1969, more than one year after the
trial of this case, this court, in *Pakos v. Clark*, 253 Or
113, 453 P2d 682, first recognized the tort of "out-
rageous conduct." In that case this court quoted with
approval, at p 122, the following rule as previously
stated in Restatement (Second) Torts 71, § 46:

> "One who by extreme and outrageous conduct in-
> tentionally or recklessly causes severe emotional
> distress to another is subject to liability for such
> emotional distress * * *."

The court then also quoted from comment *d* under
§ 46 as follows:

> "*Extreme and outrageous conduct.* The cases
> thus far decided have found liability only where
> the defendant's conduct has been extreme and out-
> rageous. It has not been enough that the defendant
> has acted with an intent which is tortious or even
> criminal, or that he has intended to inflict emo-
> tional distress, or even that his conduct has been
> characterized by 'malice,' or a degree of aggrava-
> tion which would entitle the plaintiff to punitive
> damages for another tort. Liability has been found
> only where the conduct has been so outrageous in
> character, and so extreme in degree, as to go be-
> yond all possible bounds of decency, and to be
> regarded as atrocious, and utterly intolerable in a
> civilized community. Generally, the case is one in
> which the recitation of the facts to an average mem-
> ber of the community would arouse his resentment
> against the actor, and lead him to exclaim, 'Out-
> rageous!' * * *."

In my opinion, plaintiff's pleadings and evi-
dence were sufficient to provide a proper basis upon
which the jury, if it believed such evidence, could have

properly found that defendant's conduct was "outrageous conduct" within the test approved by this court in *Pakos v. Clark*. It may be, of course, that a jury would choose to believe defendant's witnesses and to find that defendant's conduct was no more than "negligent." On the other hand, if the jury believed the evidence offered on behalf of plaintiff and proceeded to draw reasonable inferences from such evidence, the jury could have properly found the following facts:

(1) That after plaintiff found that he was unable to pay the balance of $3,911.50 on the truck purchased by him from defendant he surrendered it to defendant for resale under the terms of a chattel mortgage which imposed upon defendant the duty to account for and pay "any surplus" to plaintiff;

(2) That defendant then removed the van body from the truck and sold the truck, without the van body, for $4,000;

(3) That defendant then prepared a "repossession report" showing not only a charge of $220 for a sales commission, but also a charge of $400 for "repairs" which were never made, and resulting in an incorrect "deficiency" of $531.34;

(4) That defendant then turned over this false "deficiency" to a collection agency which, as its agent, demanded payment from plaintiff;

(5) That although plaintiff then called defendant and asked for an explanation he was given "no satisfaction" and no effort was made by defendant to correct the matter;

(6) That defendant, through the collection agency, then again demanded payment, stating falsely that

"our previous notices have been ignored" and threatening to sue plaintiff;

(7) That when plaintiff's attorney then asked for an explanation he was told by defendant that $531 was the balance remaining after these charges for sales commission and "repairs," but that defendant then refused to produce copies of the repair documents;

(8) That meanwhile defendant had sold the van body separately for $865, resulting in a substantial "surplus" payable to plaintiff, but that defendant failed to discharge its duty to either account for or pay that "surplus" to him;

(9) That even when plaintiff learned from another source that the van body had been sold separately (but not the price at which it was sold) and demanded an explanation from defendant, it continued to give him false information to the effect that the "box" (van body) was sold for only $400 and that there had been $400 in "reconditioning costs" (which were never incurred) on sale of the truck;

(10) That when plaintiff questioned that item, defendant contended that the $400 charges were for "selling and overhead expenses" which were not supported by convincing evidence and were not claimed in the original "repossession report";

(11) That such conduct caused "severe emotional distress" to plaintiff.

In my opinion, if the jury found the foregoing facts to be true, it also could have properly found from the evidence that defendant deliberately embarked upon a course of conduct intended to defraud plaintiff of money which belonged to him and which defendant was under a duty as a fiduciary to account for and pay to him and that defendant then embarked upon a fur-

ther course of conduct intended to conceal its fraud from plaintiff and was "outrageous" within the meaning of the rule as approved by this court in *Pakos v. Clark*.

An examination of the facts of recent cases confirms this conclusion, in my opinion. See *George v. Jordan Marsh Co.,* — Mass —, 268 NE2d 915 (1971); *Fletcher v. Western National Life Insurance Co.,* 10 Cal App 3d 376, 89 Cal Rptr 78 (1970); *Rugg v. Mc-Carty,* — Colo —, 476 P2d 753, 756 (1970); *Turner v. ABC Jalousie Company,* 251 SC 92, 160 SE2d 528 (1968); *Lyons v. Zale Jewelry Co.,* 246 Miss 139, 150 So 2d 154 (1963); *Delta Finance Co. v. Ganakas,* 93 Ga App 297, 91 SE2d 383 (1956); *Duty v. General Finance Company,* 273 SW2d 64 (Tex 1954); *LaSalle Extension University v. Fogarty,* 126 Neb 457, 253 NW 424 (1934); and *Barnett v. Collection Service Co.,* 214 Iowa 1303, 242 NW 25 (1932).[⊚]

With all due respect to the concurring opinion in this case, the views expressed in that opinion, without citing recent case authority, are not in accord with the clear trend of the law as demonstrated by these

---

[⊚] The pleadings and evidence in this case were also sufficient, in my opinion, to support a judgment for plaintiff on a theory of conversion. See Salem Traction Co. v. Anson, 41 Or 562, 567-69, 67 P 1015, 69 P 675 (1902); Watkins v. Layton, 182 Kan 702, 324 P2d 130, 134 (1958); Unfried v. Libert, 20 Id 708, 119 P 885, 890 (1911); Warren Tool Company v. Stephenson, 11 Mich App 274, 161 NW2d 133, 147 (1968). See also Fowler v. Courtenmanche et al, 202 Or 413, 447, 449, 274 P2d 258 (1954); Laam v. Green, 106 Or 311, 320-21, 211 P 791 (1923); and Swank v. Elwert, 55 Or 487, 496, 105 P 901 (1910). Counsel for plaintiff, however, have expressly disclaimed conversion as a basis for recovery.

Furthermore, although counsel for plaintiffs have also disclaimed a remedy in breach of contract, apparently because punitive damages are usually not allowed in such cases, that result is no longer clear where the breach involves a "scheme to defraud," as alleged in this case. See Note: Exemplary Damages in Contract Cases, 7 Will L J 137, 149 (1971).

recent decisions, in my opinion. I fail to distinguish between "outrageous" and "reprehensible," as defendant's conduct is described in that opinion. I also do not agree with the view, as at least implicit in that opinion, that in order for conduct to be "outrageous" it must consist of prolonged harassment or other misconduct.

In any event, if the jury believed plaintiff's evidence it could have properly found that defendant was guilty of a long continued course of "outrageous conduct," including threats to sue for a nonexistent debt, followed by deliberate and repeated lies in an effort to conceal the truth and retain surplus moneys which it was under obligation to pay to plaintiff. Also, in my opinion, the jury could properly have found from the facts of this case that defendant's conduct was not only fraudulent, but involved "unusual, bizarre and particularly abusive methods of execution," as apparently conceded by the concurring opinion to be sufficient to constitute "outrageous conduct." It may be that the developing tort of "outrageous conduct" should be more clearly defined and subject to more definite standards, but no such definitions or standards are proposed by the concurring opinion.

The ordinary layman, when informed of the facts of this case, and when also informed that the plaintiff's complaint must be dismissed, without even payment of the "surplus" admittedly owing to him, for the reason that his lawyer did not tell the trial judge that he was relying on a "theory" of "outrageous conduct" and because lawyers and judges cannot agree upon any proper "theory" for recovery, would indeed regard this as an "outrageous result"!

For all of these reasons, I most respectfully dissent.