Argued January 15, reversed and remanded February 15, 1973

CARTE, *Respondent, v.* FLURY BUICK-JEEP, INC., *Appellant.*

506 P2d 701

*Gerald R. Pullen,* Portland, argued the cause for appellant. With him on the brief was David R. Vandenberg, Jr., Klamath Falls.

*Sam A. McKeen,* Klamath Falls, argued the cause and filed the brief for respondent.

Before O'Connell, Chief Justice, and McAllister, Denecke, Holman, Tongue and Bryson, Justices.

TONGUE, J.

This is an action for damages arising from a transaction involving the purchase by plaintiff from defendant of a used 1962 Buick, into which the motor of plaintiff's 1961 Buick was to be installed by defendant. Defendant appeals from a jury verdict and judgment for $750 general damages and $2,500 punitive damages.

■ Before considering defendant's various assignments of error, including those involving the sufficiency of the evidence, it is necessary to review the facts, bearing in mind that in such an appeal plaintiff is entitled to the benefit of all favorable evidence and to all reasonable inferences from such evidence. *Cronn v. Fisher,* 245 Or 407, 416, 422 P2d 276 (1966).

In September 1966 plaintiff took his 1961 Buick to defendant to repair a broken lower control arm. Defendant's service manager, Mr. Ridenour, said that repairs would cost about $75. He also said that defendant had a 1962 Buick with a cracked motor block for sale and suggested that plaintiff buy it and have defendant transfer the good motor block of his 1961 Buick to that car. Plaintiff agreed.

He then purchased the 1962 Buick for $150 and left both cars with defendant for the transfer of the motor. Ridenour told him that this would cost about $150. It was also agreed that the 1961 Buick would be left "disassembled" and that there was "no use putting it back together." At that time plaintiff intended to "junk" the 1961 Buick (without a usable engine block).

A few days later plaintiff picked up the 1962 Buick and was told that the mechanic had a "little trouble" to "get your motor to fit in there." At that time he "left all the parts of the 61" with defendant, at the suggestion of Ridenour that plaintiff "sell your old car to the mechanic."

Two days later plaintiff talked to the mechanic, who offered him $50 for the disassembled 1961 Buick. He rejected that offer and the mechanic then helped him load the parts in his pickup truck to take home. At that time he noticed that the spare tire, with "85 to 90 percent rubber," the radiator, and the power steering unit were missing. He also had the 1961 chassis towed to his home.

About three days later plaintiff checked the motor numbers on the two cars and discovered that the 1961 motor had not been put into the 1962 Buick. He did not, however, notify defendant or make any complaint to defendant at that time, or until the filing of the complaint.

What had happened was that defendant's mechanic encountered difficulty in getting the 1961 motor into the 1962 Buick and then discovered that the 1962 motor block was not cracked, but had a hole in the timing chain cover that could be repaired by transferring to it that part, which was "interchangeable," from the 1961 Buick. The 1962 motor was then put back into the 1962 Buick, which operated "just like it was supposed to." The car was then delivered to plaintiff, who operated it without difficulty for 20 months and testified that it was worth $800 at the time of delivery.

Defendant's service manager, Mr. Ridenour, testi-

fied that he explained to plaintiff what had actually happened, but plaintiff denied that he did so. Plaintiff also testified that it was possible to install the 1961 motor in the 1962 car by making some minor alterations.

Forty-five days later plaintiff received from defendant a bill for $169, including $150 for labor to "switch engines" and $19.55 in gaskets, "coolant" and other parts. That bill was never paid.

Plaintiff testified that if he had known the facts he would not have purchased the 1962 Buick, but would have had the 1961 Buick repaired. He also testified that after he learned the facts he first intended to reassemble the 1961 Buick.

At some unspecified time, however, either before or after plaintiff received the bill, but after he had discovered that the motors had not been "switched" and that some of the 1961 parts had not been delivered to him, plaintiff sold the 1961 Buick, in its disassembled condition, to Mr. Dotson, a mechanic friend of his, for $75.

Also, according to plaintiff:

"The agreement was that he would buy my car, and put it back together with the parts that were supposed to have been there, the parts from Flury Buick, and that he would pick them up from Flury Buick, and that I would, if any parts were missing, I would furnish him with the parts to put this car back in the shape that it was before it reached Flury Buick."

Plaintiff also testified that there were $300 worth of parts missing at that time which he was required to furnish to Dotson under that agreement. It

appears, however, that plaintiff did not actually pay for all of such parts, although he produced some bills paid by him, including bills for $77.50 for a radiator and lower control arm, $10 for a timing cover, $7.50 for a fan and $4.50 for other parts. Mr. Dotson apparently was unable to get all of the original parts from defendant and purchased other parts. He was, however, able to reassemble the 1961 Buick, for which he was allowed $650 as a trade-in on a 1968 Mustang. As a result, Dotson said that he made "one of the best buys of the year."

Plaintiff claimed as a part of his damages the $300 for the value of missing parts. He also claimed as damages the difference between the value of the 1961 Buick at the time he took it to defendant and its value in its subsequent disassembled condition. Thus, plaintiff testified that the car was worth $600 in its previous condition, with the broken control arm, and that although it would have been worth $75 in its subsequent condition if no parts had been missing, it was actually worth nothing in its subsequent condition, considering the missing parts. In his complaint, however, plaintiff alleged that "the reasonable value of said 1961 Buick before the engine was removed was $550 [amended on trial to $700] and the value afterwards was $250."

Thus, the complaint on which the case was submitted to the jury, as amended, claimed a total of $750 in general damages, including $300 for the purchase of "new parts and labor for placing it in a running condition," and $450 for the difference between the alleged "before and after" values of $700 and $250. The jury returned a verdict for plaintiff in that full amount, together with $2,500 in punitive damages.

1. *The trial court did not err in denying defendant's
   motions for involuntary nonsuit and directed ver-
   dict.*

Defendant contends that the trial court erred in
denying its motions for an involuntary nonsuit and
for a directed verdict upon the grounds (1) that plain-
tiff did not plead and prove the elements of fraud; (2)
that plaintiff did not prove damages with reasonable
certainty; and (3) that plaintiff did not incur any
damages, but actually profited from the transaction.

We agree that plaintiff did not plead and prove
the elements required for recovery in a common law
action for fraud, most notably by failing to prove that
he did anything in reliance upon any misrepresenta-
tion by defendant. It does not follow, however, that
plaintiff was not entitled to recovery under the evi-
dence in this case.

Upon purchase by plaintiff of the 1962 Buick, de-
fendant agreed to install the 1961 motor in the 1962
car. Plaintiff delivered custody of the two cars to
defendant for that purpose and there was testimony,
which the jury was entitled to believe, that defendant
could have done so. Instead of doing so, however, de-
fendant left the 1962 motor in the 1962 Buick and left
the 1961 Buick in a disassembled condition, with its
motor block on the floor, the radiator removed, with
its hoses cut, and various other parts strewn about.
Some of these component parts were also lost or mis-
placed and were not returned to plaintiff.

It is true that, as a result, plaintiff got a
better 1962 Buick than he bargained for. In our opin-
ion, however, he was entitled to the benefit of that
bargain. Furthermore, the transaction involving his

purchase of that car, including any profit made by him on that transaction, cannot properly be considered in determining whether plaintiff was entitled to recover for any damage caused by defendant to plaintiff's 1961 Buick.

It is also true that, under the original agreement, the 1961 Buick was to be left in a disassembled condition to be "junked," without a motor, other than the 1962 motor with a cracked engine block. Again, however, there was testimony from which the jury could have found that defendant should have discovered that the 1962 Buick did not have a cracked engine block and that, accordingly, there was no good reason to disassemble the 1961 Buick by taking out the motor and the radiator and by removing other parts, except for the part needed to repair the 1962 Buick.

■ If a mechanic in whose custody an automobile is left for repairs either negligently or willfully removes or damages some part, with the result that the automobile does not operate properly and is wrecked, it is obvious that its owner would have a cause of action in tort against the mechanic to recover for the damage to his car. In a somewhat different sense, but to the same basic effect, if the jury found in this case that the 1961 Buick was damaged as a result of defendant's misconduct, then it follows that whether such conduct was negligent or willful, the plaintiff, as its owner, is entitled to recovery for the resulting damage.

It is true that plaintiff's attorney appeared to be somewhat hard-put on trial to state any accepted "theory" for recovery in this case, but finally took the position that "this complaint sounds in tort of injury to the property of another." The trial judge concluded, on the other hand, that the proper "theory" of re-

covery was an action "on the case," in reliance upon *Cash v. Garrison,* 81 Or 135, 158 P 521 (1916).

There is authority to support both positions. Thus, modern legal authorities do not speak in terms of the "label" of a tort, such as trespass, "case," or conversion, but in terms of the nature of the act and the nature of the interest invaded. Such modern authorities speak of an action for intentional interference with chattels or with interests in personal property or of an action for negligent conduct resulting in damage to chattels or personal property. See Prosser, Law of Torts (4th ed 1971) 76-77, § 14. See also Harper and James, The Law of Torts, 97-113, 945, §§ 2.2-2.6, 16.13 (1956). Cf. Restatement 417, 507 Torts 2d §§ 217 and 278. Cf. *Chaney v. Fields Chevrolet Co.,* 258 Or 606, 484 P2d 824 (1971).

On the other hand, in *Williams v. International Co.,* 172 Or 270, 141 P2d 837 (1943), where a wrecked truck had been left for repairs at defendant's garage and defendant failed to make the repairs and redeliver it to plaintiff, this court held that the proper remedy was by an action "on the case." Similarly, it was held in *Cash v. Garrison, supra* at 138 (the case relied upon by the trial court), that an action on the case was the appropriate remedy under the facts in that case for "* * * a long series of alleged wrongs and grievances, culminating in the fact that by reason of all these plaintiff has lost her investment and has been deprived of her property, * * *" despite some aspects of trover, breach of contract and deceit. Defendant questions whether "this 1916 case still has vitality in Oregon."[1]

---

[1] Decisions by this court involving actions on the case can be generally classified into two groups. One group includes cases

Regardless of whether we should seek to determine and apply the most appropriate and recognized common law remedy, or whether we should follow the approach adopted by more modern authorities, it is clear under the facts of this case that there was a bailment of the 1961 Buick by plaintiff to defendant for the purpose of "switching" its engine to the 1962 Buick and that the defendant, as an automobile dealer who undertook to provide repair service, was presumed to know the nature and the character of the work that he was about to undertake and the results likely to follow from a negligent performance of that work and is liable for any resulting damage. See Annot., 1 ALR 1654 and 44 ALR 824.

■ It is well established in Oregon that when it is shown that personal property has been delivered in good condition to a bailee and that the goods, when returned by the bailee, have been damaged, a presumption arises that such goods were damaged as a result of the negligence of the bailee. It is also established that in such a case the bailor has a choice of remedies for injury to the property and may maintain either an

in which there was an allegation of some kind of interference with commercial or economic interests, as in Budd v. Multnomah St. Ry., 15 Or 404, 15 P 654 (1887); Cash v. Garrison, 81 Or 135, 158 P 521 (1916); Korn v. Green et al, 129 Or 186, 276 P 1112 (1929); Kaller v. Spady, 144 Or 206, 10 P2d 1119, 24 P2d 351 (1933), and Condit v. Bodding, 147 Or 299, 33 P2d 240 (1934).

The second group includes cases in which the issue was whether the statute of limitations for trespass or for an action on the case applied, depending upon whether the injury to property was direct or immediate, as in Dalton v. Kelsey, 58 Or 244, 114 P 464 (1911); Miller v. City of Woodburn, 126 Or 621, 270 P 781 (1928), and Norwood v. Eastern Oregon Land Co., 139 Or 25, 5 P2d 1057, 7 P2d 996 (1932). However, in Davis v. Georgia-Pacific, 251 Or 239, 242-43, 445 P2d 481 (1968), this court abandoned the traditional rule as set forth in *Norwood, supra,* that a trespass must be a direct intrusion by a tangible object.

action of assumpsit for breach of the contract or "an action based on tort." *Willam. T. & B. Co. v. Com. Dis. Corp.,* 180 Or 657, 662-63, 178 P2d 698 (1947); *National Fire Ins. Co. v. Morgan et al,* 186 Or 285, 290, 206 P2d 963 (1949). See also Brown on Personal Property (2d ed 1955) 359-63, § 87.

■ In this case plaintiff testified that he delivered the 1961 Buick to defendant in good operating condition, except for the broken control arm, and that it was returned to him in a disassembled and inoperable condition, with its motor removed, its radiator hoses cut, the radiator and other parts removed, some of which were missing. Plaintiff also went further and offered evidence from which the jury was entitled to find that in the exercise of reasonable care defendant should have discovered that the 1962 Buick motor was not cracked and could be repaired and that defendant therefore had no good reason to disassemble the 1961 Buick or to leave it in that condition.

We hold that this evidence was sufficient to support a finding by the jury that defendant had breached its duty as a bailee, with the result that it was liable to plaintiff for such damages as resulted from that breach of duty. We also hold that this evidence was sufficient to support a finding by the jury that at least some substantial damage resulted from that breach. Accordingly, the trial court did not err in denying defendant's motion for a nonsuit and for a directed verdict.

2. *The trial court did not err in refusing to compel plaintiff to elect between remedies, but did err in instructing the jury that plaintiff could recover*

*under remedies that were inconsistent and improper.*

Defendant did not, prior to trial, file a demurrer against plaintiff's complaint for misjoinder under ORS 16.260 (5), but at the time of trial contended that it had "the right to be advised as to whether this plaintiff is proceeding in fraud, whether he's proceeding in contract, or what, in fact, he is proceeding in." Defendant assigns as error the failure of the court to require plaintiff to make such an election at that time.

■ As previously noted, the plaintiff later stated his "theory" to be that of "injury to the personal property of another." While this was perhaps not as specific as it might have been, the law on the question of exactly what is the proper "theory" for recovery in such a case is also not as clear as it might be, as previously noted. In any event, we do not believe that under these circumstances, the refusal of the trial court to compel plaintiff to make a more definite election of remedies at that time constituted prejudicial error. Cf. *Voyt v. Bekins Moving & Storage,* 169 Or 30; 38-41, 119 P2d 586, 127 P2d 360 (1942), and *Chaney v. Fields Chevrolet Co., supra.*

We agree with defendant's further contention, however, that it was entitled to have the case submitted to the jury under instructions which did not include inconsistent or improper theories of recovery. Thus, defendant contends that the court erred in instructing the jury to the effect that plaintiff was entitled to recover under any one of three theories: breach of contract, negligent performance of a bailment, or conversion. Defendant excepted on trial to each of these instructions on the ground that recovery

on such theories had not been pleaded. With reference to the latter two instructions, defendant also contended that recovery on the theory of such instructions was not supported by competent evidence.

As previously stated, we believe that there was sufficient evidence to support recovery on the theory of a breach of defendant's duty as a bailee. As also previously stated, the plaintiff in such a case may proceed in an action in assumpsit for breach of contract. Thus, there was evidence to support recovery on that theory. Although the allegations of plaintiff's complaint may have been sufficient to support recovery on that theory, however, we interpret plaintiff's complaint, as well as his statement on trial, to the effect that he was not proceeding in an action for breach of contract, but in an action in tort for injury to personal property. It follows that it was error to instruct on breach of contract.

It was also error to instruct on the theory of conversion because there was neither pleading nor evidence to support a finding that defendant converted the 1961 Buick, with the possible exception of some of the missing parts. See *Mustola v. Toddy,* 253 Or 658, 662-64, 456 P2d 1004 (1969). Compare *Jeffries v. Pankow,* 112 Or 439, 445-46, 223 P 745, 239 P 903 (1924), with *Kuhnhausen v. Stadelman,* 174 Or 290, 319, 148 P2d 239, 149 P2d 168 (1944) (dictum). See also *Richmond v. Fields Chevrolet Co.,* 261 Or 186, 493 P2d 154 (1972).

As for the instructions relating to the duty of a bailee, the tort in such a case consists of the failure of the bailee to perform his duty to return the property in good condition. The instruction given by the court was to the effect that a bailee has a duty to take

reasonable and proper care of the property so that it may be returned to the owner and that if he failed to do so he is liable for damages.

■ For reasons previously stated, there was sufficient evidence to support recovery on this theory and defendant did not except to the instruction on that ground, but on the ground that "a bailment has not been pleaded." Upon examining the complaint we find that, despite various irrelevant allegations, it was alleged, in effect, that plaintiff left the 1961 Buick with defendant to have the motor of the 1962 Buick installed in it. The complaint also alleged that defendant purposely and willfully removed parts from the 1961 Buick and that some of the parts were missing. In the absence of a demurrer or motion to make more definite and certain, we hold that these allegations were sufficient to support recovery in tort under the theory of breach of duty by a bailee. For these two reasons we also hold that it was not error to give such an instruction in this case.

3. *The court did not err in submitting punitive damages to the jury, but erred in permitting the jury to consider improper evidence of general damages and an improper measure of damages.*

Defendant contends that the trial court erred in submitting punitive damages to the jury for two reasons: (1) there was no evidence of malicious or willful conduct, and (2) defendant's service manager, Mr. Ridenour, was not a managerial officer, so as to render defendant corporation liable for punitive damages as a result of his conduct.

The record includes testimony from which the jury was entitled to find that defendant's service man-

ager, Mr. Ridenour, first suggested that the two engine blocks be "switched" and then, upon finding that it was not necessary to do so, attempted to conceal that fact by failing to inform plaintiff of what had been actually done and by giving instructions that he be mailed a false invoice for $169—to "switch engines." We believe that there was sufficient evidence from which the jury could properly find that defendant's conduct was sufficiently "malicious" or in disregard of social obligations so as to justify an award of punitive damages, under the test as stated in *Dorn v. Wilmarth*, 254 Or 236, 240-41, 458 P2d 942 (1969), and *McGill v. Huling Buick Company*, 259 Or 413, 419-20, 487 P2d 656 (1971), and cases cited therein. We also believe that there was sufficient evidence from which the jury could properly find that the executive authority conferred by defendant upon Mr. Ridenour as its service manager was of such a nature as to render it responsible and liable in punitive damages for his conduct. See *Osborn v. Teague Chevrolet*, 254 Or 486, 491, 459 P2d 988 (1969) ; *Paur v. Rose City Dodge*, 249 Or 385, 390, 438 P2d 994 (1968) ; and *Pelton v. Gen. Motors Accept. Corp.*, 139 Or 198, 205, 7 P2d 263, 9 P2d 128 (1932).

We agree with defendant's contention, however, that the trial court erred in denying defendant's motion to strike from plaintiff's complaint allegations relating to the amount claimed by plaintiff for such missing parts.

■ The normal measure of damages for the breach of the duty of a bailee to return goods entrusted to him in reasonably good condition and in cases in which such goods are returned in a damaged condition, as in this case, is the difference in the value of the goods

at the time of delivery to the bailee, as compared with the value of such goods upon being returned to the owner, i.e., the difference between the "before and after" values. See McCormick on Damages 470, § 124 (1935). See also Annot., 92 ALR2d 1408, 1445, and *Brandt v. Premier Insurance Co.*, 260 Or 392, 402-03, 490 P2d 984 (1971). Indeed, this was the measure of damages as stated by the instructions under which this case was submitted to the jury.

■ For the purpose of determining the "before" value of the 1961 Buick, there was testimony from which the jury could have found that its value upon delivery to defendant, with the broken lower control arm, was $600. Since, however, the timing chain cover of the 1961 Buick was transferred to the 1962 car, the value of that part, installed (of which there was no evidence), should be deducted from the value of the 1961 Buick as delivered to defendant for the purpose of computing the "before" value.

■ For the purpose of determining the "after" value of the 1961 Buick, plaintiff testified that in its disassembled condition, with some parts missing, it had no value. Plaintiff was bound, however, by the allegation of his complaint that its "after" value was $250.

■ Upon payment of the difference between the "before and after" value of the 1961 Buick, however, as thus computed, plaintiff is not entitled to claim as additional damages any further loss that he may have suffered upon resale of that car in its disassembled condition as the result of his agreement to supply any missing parts. Even though some of the parts may have been missing, that was a fact to be considered solely in determining the difference between the

"before and after" value of the car, including its various component parts. See Annot., 1 ALR 1654.

Because this case must be remanded for a new trial it should be stated that we also agree with defendant's remaining assignment of error that the trial court improperly permitted plaintiff to amend his complaint by increasing the alleged original, or "before," value of the 1961 Buick from $550 to $700. The testimony of the highest value of the car at the time of its delivery to defendant and in its condition at that time with the broken lower control arm, was $600. Plaintiff and Mr. Dotson both so testified. Although Mr. Dotson also testified that the car had a previous value of "between $600 and $700," he was then referring to its previous value when it was in an operating condition and "ran very good."[9]

For all of these reasons the judgment of the trial court is reversed and the case is remanded for further proceedings consistent with this opinion.

McALLISTER, J., concurs in the result.

[9] In addition, as previously noted, there was no testimony as to the value of the 1961 Buick without the timing chain cover, which was transferred to the 1962 Buick, for plaintiff's benefit, or as to the value of that part, installed, for the purpose of computing the "before" value of the car.